J-S44030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.R., JR., MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.R., SR. NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 702 WDA 2019 |

Appeal from the Order Entered April 9, 2019
In the Court of Common Pleas of Washington County Orphans' Court at
No(s):  No. 63-18-0996

BEFORE:  SHOGAN, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED OCTOBER 4, 2019**

L.R., Sr. ("Father") appeals from the order terminating his parental rights to L.R., Jr. ("Child"). We conclude the trial court did not err in terminating Father's parental rights and therefore affirm.

Child was born in September 2016 with a severe cardiac condition and remained in the hospital for nine months following his birth. His diagnoses included cardiac malformation, double outlet right ventricle, ventricular septal defect, malposed great arteries, and coarctation of the aorta. Father is in federal prison in Ohio serving a 72-month sentence for drug charges. Due to Child's condition, federal authorities released Father on bond so he could be with Child.

During Child's hospitalization, the medical staff twice called the police due to arguments between Mother and Father, and Father's "behavior disrupted other families and patients in the ICU at Children's Hospital." Trial

Court Opinion, filed May 30, 2019, at 4 ("1925(a) Op."). Father also took Child out of the ICU without any medical personnel accompanying them, against medical restrictions. *Id.* In March 2017, hospital medical staff determined that in order to release Child, there would need to be two caregivers and nursing staff in the home. However, Father had not completed the necessary training to serve as a caregiver for Child.

In April 2017, following a shelter care hearing, the court removed Child from the Father's custody, as well as that of T.B. ("Mother"), and D.C. ("Paternal Grandmother"). Shortly before Child's release from the hospital, in June 2017, the trial court adjudicated Child dependent and placed him in the care of E.K. and J.K. ("the Ks" or "the K Family"). Father returned to prison in June 2017, and has since been in federal prison in Ohio.

In August 2018, Washington County Children and Youth Services ("CYS") filed a petition to terminate Father's parental rights. At a hearing, Father testified he would be released in one-and-a-half to two years. N.T., 4/8/19, at 159. He said that he spoke to Child on the telephone when Mother or Paternal Grandmother visited with Child. *Id.* at 146. However, he admitted that the Ks obtained an order of protection against Mother. Mother has not been to the K Family home since January 2018, and Paternal Grandmother has not had visits with Child since September 2018. *Id.* at 57. Father testified he initially sent letters to Child, but stopped because the Ks never responded. *Id.* at 149.

Mrs. K transported Child to Ohio for one visit with Father. N.T., 4/8/19, at 144-45. However, a CYS caseworker, Kristy King, and the court-appointed special advocate, Susan Caffrey, both testified that at times Child's doctors had placed restrictions on Child's travel, including limiting his travel to no more than two hours, mandating that the destination be a sanitized location, and requiring two trained caregivers to accompany Child. N.T., 4/3/19, at 23-26; N.T., 4/8/19, at 104-06.

Father testified that he speaks on the telephone with his wife, with whom he has a son younger than Child, and talks to Paternal Grandmother daily. He claims he could not speak to the Ks or CYS by telephone because they did not put money on a card attached to their telephone numbers. N.T., 4/8/19, at 146-47. He has not called or otherwise contacted the Ks or CYS, and has not filed a motion for visitation.

King testified that Father had completed a substance abuse program. N.T., 4/3/19, at 27-28. Although he had a mental health evaluation to assess the safety of the inmate, he was unable to have a complete psychological evaluation. *Id.* at 35-36. King and Caffrey both testified that Child has a strong bond with Mrs. K, and he looks to her for comfort, solace, and support. N.T., 4/8/19, at 22, 114.

The court granted the petition to terminate Father's rights. It concluded, among other things, that CYS had established by clear and convincing evidence that termination was proper under 23 Pa.C.S.A. §§ 2511(a)(1) and 2511(b). The court rejected Father's argument that his counsel had been

ineffective. Mother did not contest the termination of her parental rights and is not a party to this appeal.

Father filed this timely appeal and raises the following issues:

> 1. Did the trial court err in granting the Petition For Involuntary Termination of Parental Rights of L.R., Sr. under 23 Pa.C.S. §2511 (a)(1), (2), (5) and (8) where the Agency failed to prove by clear and convincing evidence that anything other than his incarceration prevented him from fulfilling his parental obligations?
>
> 2. Did the trial court err in granting the Petition For Involuntary Termination of Parental Rights of L.R., Sr. under 23 Pa.C.S. §2511(b) in that the Agency failed to prove by clear and convincing evidence that the statutory grounds for termination best serves the needs and welfare of R , Jr.?

Father's Br. at 5.

"A party seeking to terminate parental rights has the burden of establishing grounds for termination 'by clear and convincing evidence.'" *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018) (quoting *In re Z.S.W.*, 946 A.2d 726, 728 (Pa.Super. 2008)). "Clear and convincing evidence is evidence 'that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" *Id.* (quoting *In re Z.S.W.*, 946 A.2d at 728-29).

When we review termination of parental rights cases, we "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an

error of law or abuse of discretion." ***In re Adoption of K.C.***, 199 A.3d at 473.

We will find an abuse of discretion "only upon demonstration of manifest

unreasonableness, partiality, prejudice, bias, or ill-will." ***In re Adoption of***

***S.P.***, 47 A.3d at 826.

Termination of parental rights is controlled by Section 2511 of the

Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007). Under Section

2511, the trial court must engage in a bifurcated analysis prior to terminating

parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** (citations omitted).

In the present case, the trial court terminated Father's parental rights

pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (2),[1] and § 2511(b) of the

---

[1] The trial court also found termination proper under Sections 2511(a)(5) and (8). However, CYS petitioned for termination of Father's rights under only sections 2511(a)(1) and (2). Therefore, the court erred in finding termination proper under Sections 2511(a)(5) and (8). Because we conclude CYS established grounds for termination under Section 2511(a)(1), we affirm despite the error.

Adoption Act. To affirm the trial court, "we need only agree with its decision as to any one subsection" of 2511(a), as well as subsection 2511(b). **In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

We will first determine whether the trial court erred in finding CYS established by clear and convincing evidence that termination was proper under Section 2511(a)(1). Under that section, the court may terminate if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). When considering whether to terminate under this section, "the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

"Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." **In re B., N.M.**, 856 A.2d 847, 855 (Pa.Super. 2004). Further:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.* (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (internal quotation marks and citation omitted)). Parental duty requires that a parent "act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citing *In re Adoption of Dale A., II*, 683 A.2d 297, 302 (Pa.Super. 1996)).

"[T]he fact of incarceration does not, in itself, provide grounds for the termination of parental rights." *Id.* at 855 (citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999)). "However, a parent's responsibilities are not tolled during incarceration." *Id.* Courts must determine "whether the parent utilized resources available while in prison to maintain a relationship with his or her child." *Id.* (citing *In re the Adoption of Dale, A., II*, 683 A.2d at 302). "An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children." *Id.* (citing *In the Interest of A.P.*, 692 A.2d 240, 245 (Pa.Super. 1997)).

Father argues that he "made every effort to perform his parental duties and in no way showed a settled purpose to relinquish his parental duties." Father's Br. at 23. He contends that his incarceration limited his ability to interact with Child. Father points out that he secured his release on bond so

he could be with Child during Child's medical emergency, and asserts that while out, he spent 11 hours a day in the hospital with Child and spent the night when emergencies arose. Father claims he received training on how to change Child's tracheostomy and gastrostomy tubes and that Paternal Grandmother observed Father performing parental duties while at the hospital. Father adds that after he returned to prison, he had one visit with Child and spoke with Child when Child was with Father's family members. He claims he could not contact CYS or the Ks by telephone because neither put money on his account to use the phone. He also notes he sent letters and cards to Child but stopped because the Ks were not responding. As to his permanency plan, Father argues he completed a substance abuse program and underwent a mental evaluation, but was unable to complete an anger management program because it had limited availability.

The trial court found that although Father speaks on the phone with his wife and his younger son and talks on the phone with Paternal Grandmother daily, he "has taken no such similar steps to foster a continuing relationship with [Child]." Trial Court Opinion, filed Apr. 9, 2019, at 6. He did not call the Ks' home or CYS and did not file a motion for visitation. *Id.* at 6-7.

The court also addressed Father's claim that CYS and the Ks should have done more to help him. The court noted the burden the Ks had undertaken to care for Child and concluded their efforts to have Child visit Father were sufficient. It also pointed out the limitations CYS faced in facilitating visits due to both Father's status as a federal prisoner and Child's medical condition:

> Father testified that Mrs. [K] transported [Child] one time to the North East Correctional Facility to see him. [R]egarding . . . the [K] family, the record of the dependency proceedings demonstrates the enormity of the daily tasks they shouldered to see that [Child] not only survive but thrive. A kinship care provider is not obligated to make herculean efforts to assist an incarcerated parent in maintaining a relationship with his son.
>
> With regard to [CYS], [Father's] status as a federally incarcerated prisoner in an out of state facility made insuring [sic] visitation difficult. The North East Correctional Facility is not subject to the jurisdiction of this court of common pleas. Despite having issued a writ directing [Father's] appearance at all termination proceedings, the Federal Marshall Service declined to produce [Father] and his participation had to occur by telephon[e].
>
> Further, both Caseworker King and CASA Caf[f]rey testified, at different points in time [Child's] treating doctors restricted him to traveling less than two hours, being in sanitized locations and being under the care of two trained caregivers. Finding persons capable and willing to provide such services was an extraordinary challenge. Throughout the dependency proceedings, this trial court repeatedly found [CYS] to have exercised reasonable efforts to finalize [Child's] permanency plan. Neither subsection (a) nor (b) of the Adoption Act requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights.

*Id.* at 7-8 (citations omitted).

The court found that Child had been in care for 24 months and Father had conceded that he would be unable to care for Child for another 18 to 24 months, and granted the termination petition. *Id.* at 10. The records supports the trial court's factual findings, and it did not commit an error or abuse its discretion in terminating under Section 2511(a)(1). Other than the six months during which Father was out on bail, he has been incarcerated the entirety of

Child's life and admitted during his testimony that he would not be released from incarceration for at least another one-and-a-half to two years. While incarcerated, Father has taken extremely limited steps to remain in Child's life. Although he initially sent some letters and cards, he admitted he stopped sending them. Child was approximately two and a half years old at the time of the termination, yet Father has not called Child, has not called CYS or the Ks to inquire about Child, and he has not sought visitation.

Father next claims the trial court erred in finding termination was proper under Section 2511(b). Father argues he "spent every moment he could with [Child] developing a bond." Father's Br. at 30. He claims the lack of visitation was due to Child's medical limitations, and the lack of phone contact was because CYS and the Ks did not the "take the minimal steps necessary to secure that contact." ***Id.***

Under Section 2511(b), the court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the child's best interest. 23 Pa.C.S.A. § 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. ***In re Adoption of R.J.S.***, 901 A.2d 502, 514 (Pa.Super. 2006). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa.Super. 2005). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." ***Id.***

Here, the trial court found:

> The [K] family has cared for [Child] since his discharge from Children's Hospital, some 22 months ago. A beneficial bond with them exists and they are ready and willing to provide [Child] a forever home.
>
> Throughout the last 22 months, at several court proceedings specific findings have been made concerning the appropriateness of the [Ks'] care. At every dependency proceeding, this court received evidence that established that [Child] was safe in the care of [the Ks]. Further, this trial court found that the [K] [F]amily was exercising the reasonable and prudent parent standard. The task for the [K] Family was not an easy one. [Child] continued to require nursing care 16 hours per day. The [K] Family provided the care, love and stability that [Child] required. As a consequence, both Caseworker King and CASA Caf[f]rey stated that [Child] has formed a strong bond with Mrs. [K], to whom he looks for comfort, solace and support.

Tr. Ct. Op., Apr. 9, 2019, at 9. The court concluded, "Having given primary consideration to the developmental, physical and emotional needs and welfare of [Child], this trial court finds that his individual needs and welfare are best served by achieving timely permanency." *Id.* It found that "[a]ny consideration of the resulting detriment from severing the parent child bond with [Father] is clearly outweighed by the stable and loving care that has been and remains immediately available to [Child] as a member of the [K] Family." *Id.*

The record supports the trial court's factual findings and it did not abuse its discretion in finding terminating Father's rights would best meet Child's developmental, physical, and emotional needs and welfare. Father has not been a significant presence in Child's life. In contrast, Child has been in the

Ks' care since he came home from the hospital and they have ably handled his considerable health issues, and he has formed a bond with the K Family. The court's determination under subsection (b) was not an abuse of discretion.

Finally, Father contends that he had inadequate legal representation during the dependency proceedings. Although Father listed this issue in his Pa.R.A.P. 1925(b) statement, he did not include it in the statement of questions involved in his brief. *See* Pa.R.A.P. 2116(a). We will nonetheless consider it on the merits, as the trial court addressed it and Father's failing in this regard does not hamper our review. *See In re Adoption of G.K.T.*, 75 A.3d 521, 524 n.4 (Pa.Super. 2013).

Father argues dependency counsel did not call or otherwise contact Father, other than an initial letter of representation, and failed to appear at two permanency review hearings. He further argues that counsel failed to fight "for additional visitation, challenge[] the doctor's recommendation that [Child] not visit out of state, assist[] in setting up phone contact, and assist[] in making sure [Child] received the letters [Father] sent." *Id.*

In dependency and parental termination cases, parents have the right to effective assistance of counsel. *In re K.D.*, 871 A.2d 823, 829 (Pa.Super. 2005); *In re J.T.*, 983 A.2d 771, 774–75 (Pa.Super. 2009). However, the "right is more limited than that in criminal cases, as claims of ineffective assistance of counsel must be raised on direct appeal." *In re J.T.*, 983 A.2d at 774-75. To determine whether counsel was ineffective, we "review the record as a whole to determine whether or not the parties received a

'fundamentally' fair hearing" *Id.* at 775. To establish ineffectiveness of counsel for dependency proceedings, the parent must establish "by clear and convincing evidence that it is more likely than not that the result would have been different, absent the ineffectiveness," that is, that the child would not have been found dependent. *In re K.D.*, 871 A.2d at 829. Similarly, counsel will be found ineffective during termination proceedings "only if the parent demonstrates that counsel's ineffectiveness was the cause of the decree of termination." *In re J.T.*, 983 A.2d at 775 (quotation marks and citation omitted).

Here, the trial court found Father did not establish ineffectiveness was the cause of the adjudication of either dependency or termination and did not establish any alleged ineffectiveness affected the fundamental fairness of the hearings:

> [A] review of the dependency record does not support [Father's] claims of ineffectiveness of counsel. . . . During the termination proceeding, [Father] did not contend that the unprofessional error of his dependency counsel led to [the] finding that clear and convincing evidence of parental incapacity was proven. As the Order of Adjudication recites in detail, the merit hearing was an extended proceeding during which the testimony of multiple medical witnesses demonstrated [Child's] fragile medical condition. [Father] did not testify at the proceeding and his counsel informed this [trial] court that [Father] would be pleading guilty to federal charges within three weeks of the merit hearing. Testimony from several medical witnesses well established that [Father] had not been consistent in participating in [Child's] care, had disrupted the pediatric ICU, had disregarded medical restrictions for [Child] and was not ready or capable of providing necessary care to [Child].

[Father's] claim appears to be premised upon alleged post-merit hearing ineffectiveness of his counsel in the dependency proceedings. However, such a claim is suspect. [Father] never contended that he was ready, willing and able to parent [Child]. Following the merit hearing and throughout the dispositional and many review hearings [Father] remained incarcerated and unavailable to provide care for [Child]. At the time of the termination proceedings, [Father] remained incarcerated and believed he may be [released] within the next 18 to 24 months. As the appellant, [Father] must show by clear and convincing evidence that it is more likely than not that the result would have been different, absent the ineffectiveness of his prior counsel. *In re K.D.*, 871 A.2d 823, 829 (Pa. Super. Ct. 2005). With regard to the outcome of the prior dependency proceedings, [Father] has not done so.

Further, with regard to this termination proceeding, [Father] has not sufficiently demonstrated that his dependency counsel's ineffectiveness undermined the fundamental fairness of the termination proceedings. . . . In this instance, new counsel was appointed to represent [Father] in the termination proceedings. Multiple postponements were granted to [Father] to make certain that he and his counsel were prepared and ready to proceed. [Father's] termination counsel was given a full and fair opportunity to cross-examine witnesses and present evidence. [Father] has not alleged that his counsel in the termination proceeding was ineffective.

Instead, in an omnibus approach, [Father] has assailed the efforts of [CYS], the kinship caregivers and his dependency counsel. In [Father's] view all could have done more to help maintain his relationship with [Child]. With regard to [CYS], denying termination is not the remedy for an agency's failure to provide services because such action would "punish an innocent child, by delaying permanency." *In re D.C.D.*, 629 Pa. 325, 347, 105 A.3d 662, 675 (2014). With regard to the kinship caregivers, [Father's] expectations are unrealistic given the amount of care that [Child] required, his tender age, fragile medical condition and the travel restrictions his doctors imposed.

> Finally, with regard to dependency counsel's alleged ineffectiveness, such if assumed to be true, did not cause the decree of termination. . . .
>
> [T]he record contains little credible evidence of [Father's] effort to maintain a place of importance in [Child's] life. According to [Father], he has made efforts to maintain a relationship with his wife and new son but he declined to contact [CYS] regarding visitation or further contact with [Child]. Twenty-two (22) months elapsed from the date of adjudication of [Child] to the last termination hearing. [Father] during that period of time made no progress with regard to the circumstances that required placement. [Father] demonstrated no compliance with court ordered services aimed at remedying his parental incapacity. Ms. King testified credibly that [CYS] explained to [Father the] Adoption and Safe Families Act timeliness [requirements] and the need for his timely efforts to reunify with [Child]. The evidence presented established that [Father] saw and communicated with [Child] sporadically. In some instances, [Father] used his opportunity to talk to and see [Child] for other purposes. As Ms. King recounted, in some instances [Father] used some of those occasions to confront [Mother] about her "siding" with [Child's] caregivers.

1925(a) Op. at 3-7 (some citations omitted).

We agree with the trial court. Father has not established that the outcome of the dependency or termination proceedings would have been different but for counsel's conduct. His ineffectiveness claim fails.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/4/2019

- 15 -